## 57948. COCHRAN v. THE STATE.

BANKE, Judge.

The appellant was convicted of eight counts of aggravated assault after he drove his car into a crowd of people who had assembled to observe a Ku Klux Klan rally near Plains, Georgia. He appeals the denial of his motion for new trial. *Held:*

1. The evidence more than amply supports the verdict.

2. The trial court erred in denying the appellant's challenge to the array of the grand jury without first

allowing defense counsel an opportunity to question the jury commissioners about the procedures which they had used to compile the grand jury list.

"The requirements for making out a prima facie case for discrimination are two-fold. First, the appellant must prove that an *opportunity for discrimination* existed from the source of the jury list, and, second, that the use of that infected source produced a *significant disparity* between the percentages found present in the source and those actually appearing on the grand and traverse jury panels." *Barrow v. State,* 239 Ga. 162, 164 (236 SE2d 257) (1977).

The appellant introduced evidence showing that blacks made up 18.1 percent of the grand jury panel from which the grand jury that indicted him was chosen; whereas, according to the 1970 census, blacks make up 39 percent of the eligible population of the county as a whole. The comparative disparity between the percentage of blacks in the population and the percentage of blacks on the grand jury list was thus shown to be 54 percent. However, the trial court declined to view the general population as the "source" of the grand jury list as that term is used in *Barrow v. State,* supra, and for this reason concluded that the defendant's statistics did not support a prima facie showing of racial discrimination. Thus, the court deemed it unnecessary to hear testimony from the jury commissioners on the "opportunity for discrimination" issue.

As noted above, *Barrow* holds that a prima facie case of discrimination is established when the evidence shows both that an opportunity for discrimination existed from "the source" of the jury list and that the use of that "infected source" produced a significant disparity between the percentages found present in "the source" and those actually appearing on the jury panel. *Barrow v. State,* supra, at 165. Since, under Code Ann. § 59-106, the grand jury panel is chosen from the traverse jury list and, since the population as a whole could not logically be termed an "infected source" which could give rise to an opportunity to discriminate, the court determined that the source of the grand jury panel must be the traverse jury list rather than the general population. However, the

defendant had introduced no evidence showing the racial composition of the traverse jury list. Thus, the court ruled that there was no need for further consideration of the jury challenge.

While the lower court's interpretation of the language in *Barrow* is both logical and reasonable, it is clear from the *holding* in that case and in other cases dealing with the issue that it is the difference between the percentage of blacks on the grand jury list and the percentage in the population as a whole which actually determines whether "significant disparity" exists. See Turner v. Fouche, 396 U. S. 346, 360-361 (90 SC 532, 24 LE2d 567) (1970); *Sanders v. State,* 237 Ga. 858 (1) (230 SE2d 291) (1976); *Fouts v. State,* 240 Ga. 39 (1), 41 (239 SE2d 366) (1977); *Gould v. State,* 131 Ga. App. 811 (1) (207 SE2d 519) (1974), affirmed in pertinent part 232 Ga. 844 (209 SE2d 312) (1974). It is also clear that a comparative disparity of 54 percent between these two figures is amply "significant" to authorize an inquiry into whether an *"opportunity for discrimination* existed from the source of the jury list." *Barrow v. State,* supra, at 165. See also *Fouts v. State,* supra; *Gould v. State,* supra.

As used in the "opportunity for discrimination" context, the "source" of the jury list evidently becomes the list of registered voters rather than the population as a whole, since it is from the registered voters list that the jury commissioners select the initial jury array. See *Barrow v. State,* supra, (2b). See generally Code Ann. § 59-106. While not required to do so, the defendant in this case offered evidence that an opportunity for discrimination existed from the registered voters list even before he attempted to question the jury commissioners. The transcript reveals that the voter registration list for Sumter County is maintained on a segregated basis by the use of separate file cards for whites and blacks. See Whitus v. Georgia, 385 U. S. 545 (87 SC 643, 17 LE2d 599) (1967). Under these circumstances, there can be no question that the trial court erred in refusing to allow the defendant to call the jury commissioners as witnesses to explain the relatively small percentage of blacks on the grand jury list.

3. The state contends that even if the defendant's

figures showing the racial composition of the grand jury panel otherwise support his charge of racial discrimination, those figures are without probative value because they were based on hearsay. The witness who provided the figures was an expert statistician called by the defense. He stated that he had obtained them from research done by defense counsel and defense counsel's staff, which included the defendant's wife. The state did not object to the testimony at the time.

"Generally, an expert cannot state his opinion based upon observations or reports which are not admitted in evidence. [Cits.] On the other hand, an expert can give an opinion based upon facts which he personally observes. [Cits.] And where an expert personally observes data collected by another, his opinion is not objectionable merely because it is based, in part, upon the other's findings. [Cit.]" *Dual S. Enterprises v. Webb,* 138 Ga. App. 810 (4), 813 (227 SE2d 418) (1976). The expert in this case testified that he had personally satisfied himself as to the accuracy of the figures by conducting a series of spot checks. Thus, we hold that the evidence as to the racial makeup of the jury list was both competent and admissible.

4. We similarly reject the state's contention that the burden was on the appellant to show that he was harmed by the manner in which the grand jurors were selected. Once the defendant puts forth a prima facie case of discrimination in the jury selection process, the burden is not on him to show harm, it is on the state to prove harmlessness. Accord, Whitus v. Georgia, 385 U. S. 545, supra; *Sullivan v. State,* 225 Ga. 301, 303 (168 SE2d 133) (1969). We are aware of no case where this has been successfully done, although it was intimated in *Sanders v. State,* 237 Ga. 858 (1), supra, that a proportionate representation of blacks on the grand jury which actually indicted the defendant would render harmless any racial discrimination involved in the selection of the grand jury panel as a whole.

5. In response to the defendant's contention that the court erred in refusing to grant him a change of venue, we quote extensively from the Supreme Court's decision in *Patterson v. State,* 239 Ga. 409 (5) (238 SE2d 2) (1977):

"The decision to grant a change of venue lies within the discretion of the trial court, and its discretion will not be disturbed absent an abuse of that discretion. *Allen v. State,* 235 Ga. 709, 713 (221 SE2d 405) (1975); *Jarrell v. State,* 234 Ga. 410, 415 (216 SE2d 258) (1975).

"The record before us shows a very extensive voir dire questioning of the prospective and selected jurors. The record establishes beyond doubt that the jurors selected stated that nothing they had seen, heard or read had caused them to form an opinion for or against appellant and that they had no fixed opinion as to his guilt or innocence. The test adopted by this court in determining whether or not a change of venue should be granted is whether the jurors summoned to try the case have formed fixed opinions as to guilt or innocence from unfavorable pre-trial publicity. *Coleman v. State,* 237 Ga. 84, 91 (226 SE2d 911) (1976); *Krist v. Caldwell,* 230 Ga. 536 (198 SE2d 161) (1973). When the evidence is viewed in light of the established standard, we find that the trial court did not abuse its discretion in overruling the change of venue motion." *Patterson v. State,* supra, at 418.

An additional ground for upholding the denial of the motion for change in venue is that the defendant failed to use all of his peremptory challenges. "The general rule is that appellate courts will not reverse the trial court's overruling of a motion for change of venue where the appellant has not exhausted his peremptory challenges. [Cits.]" *Coleman v. State,* supra, at 92. The rule is particularly applicable to this case, since only one of the jurors actually selected to serve had been challenged for cause by the defendant.

6. The defendant enumerates as error the trial judge's refusal to disqualify himself due to personal prejudice and bias allegedly demonstrated against the defendant at the hearing on his challenge to the array of the grand jury. We have carefully reviewed the portions of the transcript cited in support of these allegations and have found no indication that the court was prejudiced against either the defendant or his case. Furthermore, even had such prejudice existed, it could not have affected the jury's verdict unless it had somehow been communicated to the jury, something which is not even

alleged to have taken place. The defendant's conviction resulted not from any prejudice on the part of the court but from the overwhelming body of evidence introduced against him. This enumeration of error is without merit.

7. There was no evidence to support a charge on justification as a defense, and consequently the trial court did not err in refusing to give one. The defendant's contention that the jury might have found his actions justified by the need to prevent a terroristic act (cross burning) by the Klan is fatuous. Code Ann. § 26-1307 (b) states: "A person commits a terroristic act when he uses a burning or flaming cross, or other burning or flaming symbol or flambeau *with the intent to terrorize another or another's household.*" There is no evidence to indicate that any person on the scene was being threatened or terrorized until the defendant drove his car into the crowd.

8. The defendant also contends that the trial court erred in refusing to charge on involuntary manslaughter. However, the transcript discloses that such a charge was in fact given.

9. There is no merit in the contention that the court erred in failing to charge that the prosecution has the burden of proving the defendant sane beyond a reasonable doubt. In the first place, the trial court did give such a charge. In the second place, the prosecution has no such burden. See *State v. Avery,* 237 Ga. 865 (230 SE2d 301) (1976).

10. The trial court committed no error in sequestering the defendant while his wife testified in support of his motion for a change in venue. While the rule of sequestration normally does not apply to a party, the trial court may in the exercise of its discretion sequester a party who elects to call his witnesses before testifying on the same issue himself. *Ross v. Rich's, Inc.,* 129 Ga. App. 716 (1) (201 SE2d 159) (1973) and cits. Although, of course, this rule would not apply to a defendant in the actual trial of a criminal case, the testimony involved here was offered in support of the defendant's pretrial motion, prior to the joining of issue and prior to the impaneling of a jury. Defense counsel announced that both the defendant and his wife would testify concerning threats which they

had allegedly received. The state invoked the rule of sequestration, and the trial court instructed defense counsel to call the defendant first, so that he would not be able to listen to his wife's testimony before testifying himself. Rather than comply with this instruction, counsel announced that the defendant would invoke his fifth amendment privilege "[a]t the present time." The court thereupon sequestered the defendant until his wife had finished her testimony. At that time, the defendant changed his mind about invoking his fifth amendment privilege and took the stand in support of the motion for change in venue.

Under the above circumstances, it is clear that the defendant's sole motive in claiming a "temporary" fifth amendment privilege was to frustrate the application of the rule of sequestration. The tactic was obviously undertaken in the utmost bad faith, and, under these circumstances, the trial court's decision to sequester the defendant was eminently reasonable. Furthermore, it could not have harmed the defendant in any way.

11. It was not error to refuse to grant a mistrial based on the court's use of bailiffs who were also "prospective" witnesses for the prosecution. It appears from the transcript that in response to the motion for mistrial, the court ordered that no one who was a law enforcement officer, who had participated in the defendant's arrest, or who was a witness in the case was to have any contact with the jury. Defense counsel's response was, "Okay. Thank you, your honor." Thus, even assuming *arguendo* that there was any merit in the motion for mistrial, it was waived.

12. The constitutional attacks on Code Ann. §§ 59-112 (b) and 59-501 cannot be considered. In the first place, there is no indication that the constitutionality of either of these statutes was considered in the trial court. See *Alexander v. State,* 239 Ga. 810 (239 SE2d 18) (1977) and cits. In the second place, no official citation to the statutes has been provided. It has repeatedly been held that "an attack upon a section of the Annotated Code which has been incorporated in the Code since the adoption of the Code of 1933 is not an attack upon the constitutionality of any law." *Adams v. Ray,* 215 Ga. 656

(1), 660 (113 SE2d 100) (1960). See *Bible v. Marra,* 226 Ga. 154, 156 (1) (173 SE2d 346) (1970).

13. The defendant contends that his trial counsel were ineffective because they made numerous pretrial motions and held numerous "unproductive press conferences" which lessened his chances for a reduced sentence. There is, of course, no indication whatsoever that the trial judge encouraged such tactics or otherwise shares any responsibility for them.

The evidence of guilt in this case is beyond question. Defense counsel filed and argued almost every pretrial motion conceivable, conducted three days of voir dire examination, and called 13 witnesses during the course of the 4-day trial, including Mrs. Lillian Carter, the mother of the President of the United States. While some of the tactics engaged in by the defense might, as counsel suggests on appeal, be construed as "grand-standing," this does not establish ineffective assistance of counsel. To so hold would be to encourage defense counsel to attempt to maximize confusion during the course of all criminal trials, secure in the knowledge that if the attempt fails to produce an acquittal by the jury, it will constitute reversible error on appeal.

"The fact that the case could have been tried differently on behalf of the defendant does not mean that he failed to receive a vigorous and competent defense." *Fortson v. State,* 240 Ga. 5 (1), 6 (239 SE2d 335) (1977). This enumeration of error is without merit.

14. Due to the trial court's error in refusing to allow the defense to call the jury commissioners as witnesses in support of the challenge to the array of the grand jury, the judgment of conviction must be vacated and the case remanded for a new hearing to complete the record on that challenge. Should the trial court determine in light of the completed record that the challenge should be granted, then the state may seek a new indictment and trial. Should the trial court deny the jury challenge on the basis of the completed record, then the judgment of conviction shall be reinstated.

*Judgment vacated and case remanded with direction. Underwood, J., concurs. McMurray, P. J., concurs in the judgment only.*

486

*Donald L. Lamberth,* for appellant.
*Claude N. Morris, District Attorney, Howard S. McKelvey, Jr.,* for appellee.